1

2

3

4

5

6

7

8 IN THE UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10 CRUZ ARMANDO AVILA,

11            Petitioner,                 No. CIV S-03-1173 RRB EFB P

12   vs.

13 ANTHONY LaMARQUE, Warden,

14          Respondent.          <u>FINDINGS & RECOMMENDATIONS</u>

15 _____/

16        Petitioner is a state prisoner proceeding through counsel with an application for a writ of

17 habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 1998 judgment of

18 conviction entered against him in the Sacramento County Superior Court on charges of first

19 degree murder, burglary and attempted robbery.  Petitioner seeks relief on the grounds that: (1)

20 he was denied his constitutional rights to due process and a fair trial when the trial court

21 improperly admitted two "pay/owe sheets" into evidence; (2) he was denied his constitutional

22 rights to due process and a fair trial when the trial court admitted into evidence Joseph Cobb's

23 statements to police and instructed the jury that it could use those statements to determine

24 petitioner's motive; (3) he was denied his constitutional right to due process as a result of

25 cumulative error during his trial; (4) the evidence was insufficient to support the jury finding that

26 petitioner acted with reckless indifference to human life; (5) he was denied his constitutional

1

1  rights pursuant to the Sixth and Fourteenth Amendments when the jury was instructed that the

2  defenses of self-defense, imperfect self-defense and the defense of others did not apply in felony-

3  murder cases; (6) his sentence of life without the possibility of parole constitutes cruel and

4  unusual punishment; and (7) he was denied his constitutional right to a fair trial when the

5  prosecutor committed misconduct during closing argument.  Upon careful consideration of the

6  record and the applicable law, the undersigned recommends that petitioner's application for

7  habeas corpus relief be denied.

8  **I.      Procedural Background**

9          After a jury trial, petitioner was convicted of first degree murder, burglary and attempted

10 robbery.[1]  Clerk's Transcript on Appeal (CT) at 647-49.  The jury found true special

11 circumstances that the murder was committed during the commission or attempted commission

12 of a burglary and a robbery.  *Id.*  The jury also found true allegations that petitioner personally

13 used a gun during each of the crimes.  *Id.*  Petitioner was sentenced to life without the possibility

14 of parole plus a three-year determinate prison term.  *Id.* at 756.

15         Petitioner and co-defendants Reynoso and Cobb filed timely appeals in which they each

16 joined in the arguments made by the others.  Answer, Exs. A, B, C.  The California Court of

17 Appeals for the Third District affirmed all of the judgments of conviction.  Answer, Ex. H.  On

18 June 12, 2002, petitioner filed a petition for review in the California Supreme Court.  Answer,

19 Ex. I.  That petition was summarily denied by order dated July 17, 2002.  Answer, Ex. J.

20 Petitioner filed the instant petition for  writ of habeas corpus on June 2, 2003.

21 /////

22 /////

23

24         [1]  Petitioner was tried jointly with co-defendants David Reynoso and Pablo Cobb.  Mr.
   Reynoso filed a petition for writ of habeas corpus with this court on February 12, 2003, in case
25 No. S-03-272 RRB EFB P (hereinafter Reynoso habeas).  Mr. Cobb filed a petition for  writ of
   habeas corpus with this court on July 8, 2004, in case No. S-04-1299 RRB EFB P (hereinafter
26 Cobb habeas).  All three cases have been related in this court.

1 **II.     Factual Background**[2]

2     **A.  The Prosecution Case**

3         The victim of the crimes was 22-year-old Nick Godinez (Godinez). Godinez, his girlfriend Kristina Ramirez (Kristina), and their baby
4 girl lived in a house on 25th Street in the south area of Sacramento.

5         Kristina had known the defendants – Avila, Cobb, and Reynoso – for years.  Godinez had been introduced to Avila, but not to the
6 other defendants.  Indeed, in the first week of March 1996, Kristina and the defendants were together at a birthday party for
7 her best friend, Gumecinda Guillen.

8         After 2:00 in the morning of March 6, 1996, Godinez was at home, drinking and playing a video football game in his living room with
9 his cousin, Guillermo Mayorga (whose nickname is "Gigi"). Kristina and the baby were asleep in the master bedroom.

10

11         According to Mayorga, he and Godinez were interrupted by a loud crashing noise at the front door.  Godinez ran toward the hallway.
12 As Mayorga got up to follow, he heard what he believed was the loud sound of a gun cocking or "racking," and a man saying, "Get the fuck on the ground.  Spread your legs. Spread your hands.
13 Don't fucken move.  Don't turn.  Don't look.  Fucken lay down, or I'm going to fucken spray your ass."  Although Mayorga did not
14 see who spoke, he believed there were at least two intruders. When Mayorga heard shots coming from a back room, he looked
15 up, and seeing no one, escaped through a back door.

16         Kristina awoke to Godinez's shouts for her to "get down."  While Kristina shielded the baby with her body on the floor, the
17 bedroom door was thrown open.  Kristina heard a struggle and shots on the other side of the bed, and then heard more struggling and shots in
18 the hallway, but she could not see well enough to identify anyone. After the intruders fled, Godinez called Kristina from the entry of
19 the house, told her that he had been shot, and asked her to call for help.  Finding her own phone dead, Kristina ran to a neighbor's
20 house.[3]  When she returned, Godinez was lying on the entry floor and they talked for a while.  Godinez told Kristina that he did not
21 know who had shot him.  Godinez died on the floor.

22         The autopsy revealed that Godinez had sustained three bullet wounds in his left upper back, which were angled sharply
23

24     [2]  This statement of facts is taken from the May 2, 2002 opinion by the California Court
of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 3-11, appended as
25 Exhibit H to Respondent's Answer, filed on August 7, 2003.

26     [3]  Police records indicate a 911 call was placed by the neighbor at 2:27 a.m.

downward, as though Godinez was shot by someone standing above him.

A .45 caliber Randall pistol that Godinez usually kept in the master bedroom was next to him in the entry; it was jammed and inoperable.

The interior wooden casing for the front door, to which deadbolt casing and another latch had been attached, was shattered, showing the door had been broken in.

Three guns were recovered at or near the 25th Street house: a loaded nine-millimeter Taurus handgun found under the bed in the master bedroom; a loaded .25 caliber semiautomatic handgun recovered from nearby bushes; and a loaded nine-millimeter Mac 10 semiautomatic gun also recovered from a neighbor's yard.[4]

Forensic evidence established that Godinez was killed by shots fired from the Mac 10. Expended shell casings found both inside and outside the front door were also determined to have been fired by the Mac 10. No evidence was found that either the nine-millimeter Taurus or the .25 caliber pistol had been fired at the house.

Expended bullets and shell casings were found in the master bedroom and were determined to have been fired from Godinez's gun.

Within minutes of the arrival of emergency personnel to the 25th Street house, a nearby hospital called police to report two gunshot victims – defendants Avila and Reynoso. Reynoso had suffered gunshot wounds to his right knee and left shoulder. Significantly, the bullet recovered from Reynoso's knee was determined to have been shot from the Mac 10 found in Godinez's neighbor's yard. Avila had a gunshot wound in his side.

A nurse in the emergency room, who was attending to Reynoso, reported to police that she overheard him telling Avila in a hushed, urgent voice what Avila should say to police.

Interviewed by police at the hospital, Reynoso was uncooperative and belligerent, refusing initially to give his name or any details of the shooting. Police heard Reynoso tell Avila not to speak to the police because "the police cannot help us." Reynoso later denied any involvement in the shooting near 25th Street. He instead told

_____

[4] The police officer who recovered the Mac 10 testified that chambering the initial round in that gun would create a "very loud, very distinctive" sound that "most people" with experience would recognize as the loading of a firearm.

4

police that he had been shot while trying to buy drugs at a park, when "three black guys tr[ied] to rob us."

The police's initial attempts to interview Avila at the hospital were repeatedly interrupted by Reynoso.  Although initially uncooperative and reporting he had been shot while with Reynoso at a park, Avila later agreed to answer questions about the shooting on 25th Street and conceded his involvement.  He admitted kicking the front door, being armed with a .25 caliber gun, and throwing the gun into some bushes as he left the house.

Police also found Avila's driver's license in a car owned by Reynoso's girlfriend.  Blood was on both passenger seats.

The prosecution's theory of the case was that Godinez was a drug dealer from whom defendants had intended to steal drugs or cash.

Two slips of paper discovered by police in Godinez's kitchen were introduced into evidence.  The first, People's Exhibit 128, was a Tower Records receipt dated March 3, 1996, bearing a list of handwritten entries on the reverse side:  "Dru 5,850; Dre 1,300; Rovt 7,000; Gigi 3,500; T 600."  The second, People's Exhibit 127, contained a similar series of handwritten entries:  "Dru 2,300; Dre 1,400; Tre 1,400; B.B. 2,000; J 7,100; R 500; Gi 800." Kristina identified the signature and handwriting on Exhibit 128 as Godinez's.  But she was not asked to identify the handwriting on Exhibit 127.  Moreover, Kristina testified that she did not know the meaning of the entries on Exhibits 127 or 128, except to say that she recognized the entry "Gigi" on exhibit 128 as a reference to Godinez's cousin Mayorga.

A police expert in methamphetamine trafficking testified that he "instantly" believed that People's Exhibits 127 and 128 were examples of the "very common pay/owe sheet[s]" used by drug dealers to record their transactions, and that the entries on those sheets suggested transactions of an "upper level" dealer, who dealt in pounds (not ounces) of methamphetamine.  He testified that it is common not to find any narcotics at the drug dealer's residence because the dealers prefer to store them at a safe house.  Indeed, a drug-sniffing dog detected no methamphetamine or cocaine at the Godinez residence, only some marijuana.

Defendant Cobb's older brother, Joseph Cobb (Joseph or Joseph Cobb), testified at trial.  He denied that he had ever heard defendants discussing Godinez.  Although Joseph admitted that he might have heard from someone that Godinez "might had been

balling," he denied discussing that fact with defendants.[5] However, in a recorded interview with police played for the jury, Joseph had reported that Reynoso and Avila had told him that Godinez was "balling" and selling drugs. Joseph had also reported that Kristina had told her friend, Gumecinda Guillen, while they were all together at Guillen's home, that Godinez was dealing in drugs.

A separate jury, which was empaneled to determine the allegations against defendant Cobb alone,[6] also heard Cobb's videotaped confession to police. Cobb admitted learning from Reynoso that Godinez "was a big time drug dealer. He sold, you know, pounds and all kinds of stuff and had all kind of money and stuff." According to Cobb, all three defendants went to Godinez's house intending to "lick[7] this baller," so that they could "get the dope and the money." Cobb admitted that he shot Godinez and wounded Reynoso accidentally, while Godinez and Reynoso were scuffling on the floor in the entry of Godinez's house. Cobb explained, however, that he shot Godinez only after Godinez first shot at him.

Cobb's jury also heard evidence that after Avila and Reynoso went to the hospital, Cobb had called his friend Oscar Norton to pick him up from a nearby market. Norton testified that Cobb had told him that Avila and Reynoso had been shot when they had gone "to go lick some dude."

**B. The Defense Case**

Reynoso testified at trial to a different scenario than that outlined by the prosecution. He said that he knew Godinez well because in the past years, Godinez had "fronted" him methamphetamine to sell. Reynoso stated that two years prior to the shooting, he had received drugs to sell from Godinez – five pounds of methamphetamine worth $20,000. However, Reynoso never paid Godinez because the drugs had disappeared from Reynoso's apartment while he was in jail on an unrelated charge.

Reynoso testified that Godinez contacted him on the night of the murder and asked him to come over "to discuss the problem we had with the money" that Reynoso still owed him from the drugs.

---

[5] "Balling" is slang for having a lot of money or succeeding financially. It can also refer to narcotics dealing.

[6] All three defendants were tried in the same proceeding, but the action against Cobb was tried to a separate jury in light of his pretrial confession.

[7] To "lick" someone means to rob the person.

6

1    Reynoso explained these circumstances to Cobb and Avila.
     Because "there might be a problem," Reynoso asked them to
2    accompany him to Godinez's house and to bring their guns "just in

3
     case."  Avila drove the car to Godinez's house.  Reynoso testified
4    that he carried the nine-millimeter Taurus.

5    According to Reynoso, he went alone to Godinez's front door,
     knocked, and was admitted by Godinez.  (But Mayorga and
6    Kristina testified that Godinez never indicated that he was
     expecting Reynoso, and Mayorga testified that no one ever
7    knocked on the door or asked to be admitted.)  According to
     Reynoso, after Godinez closed and locked the door behind him,
8    Godinez drew a gun and demanded:  "Yeah, where's my shit now?
     I'm either going to get paid, or you're going to get smoked."
9    Reynoso testified that he ran down the hallway into the master
     bedroom, yelling for Kristina.  Reynoso and Godinez fell over
10   each other and began wrestling for Godinez's gun when it went
     off.  Reynoso felt himself shot in the shoulder, and his gun
11   dropped to the floor.  Reynoso saw that Godinez's gun had
     jammed, tried to escape, and yelled for help.  Then he noticed the
12   front door, which was open.  As Reynoso neared the front door,
     Godinez grabbed him from behind.  As the two were wrestling
13   again on the floor, Reynoso heard some shots and felt something
     like a hammer hit his knee.  Godinez stopped struggling, and
14   Reynoso saw Cobb for the first time.  Cobb helped him up and out
     of the house.
15
     Reynoso and Cobb ran to the car.  Avila was already driving.
16   Cobb told the others that he had shot Godinez, saying, "Man, I had
     to do it.  I had to do it."
17
     Reynoso also admitted that he and the others had fashioned a lie to
18   tell the police about how he and Avila had been shot because Cobb
     wanted them to conceal his involvement.
19
     Cobb's mother testified on her son's behalf that Cobb was living
20   with her in March of 1996, and that she had never before seen the
     Mac 10 used to shoot Godinez.
21

22   **III.   Analysis**

23        **A.  Standards for a Writ of Habeas Corpus**

24        Federal habeas corpus relief is not available for any claim decided on the merits in state

25   court proceedings unless the state court's adjudication of the claim:

26             (1) resulted in a decision that was contrary to, or involved an

                                       7

1  unreasonable application of, clearly established Federal law, as
   determined by the Supreme Court of the United States; or

2

3  (2) resulted in a decision that was based on an unreasonable
   determination of the facts in light of the evidence presented in the
   State court proceeding.

4

5  28 U.S.C. § 2254(d).

6      Under section 2254(d)(1), a state court decision is "contrary to" clearly established

7  United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

8  set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

9  indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

10 result. *Early v. Packer*, 573 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

11 (2000)).

12     Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas

13 court may grant the writ if the state court identifies the correct governing legal principle from the

14 Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

15 case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because

16 that court concludes in its independent judgment that the relevant state-court decision applied

17 clearly established federal law erroneously or incorrectly. Rather, that application must also be

18 unreasonable." *Id*. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not

19 enough that a federal habeas court, in its independent review of the legal question, is left with a

20 'firm conviction' that the state court was 'erroneous.'")

21     The court looks to the last reasoned state court decision as the basis for the state court

22 judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a

23 decision on the merits but provides no reasoning to support its conclusion, a federal

24 habeas court independently reviews the record to determine whether habeas corpus relief is

25 available under section 2254(d). *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

26 ////

**B. Exhaustion of State Court Remedies**

In claim No. 1 in the instant petition, petitioner argues that he was denied his constitutional rights to due process and a fair trial when the trial court improperly admitted two "pay/owe sheets" into evidence.  In claim No. 2, petitioner argues that he was denied his constitutional rights to due process and a fair trial when the trial court admitted into evidence Joseph Cobb's statements to police and instructed the jury that it could use those statements to determine petitioner's motive.  In claim No. 3, petitioner argues that he was denied his constitutional right to due process as a result of cumulative error during his trial.  In claim No. 5, petitioner claims that he was denied his constitutional rights pursuant to the Sixth and Fourteenth Amendments when the jury was instructed that the defenses of self-defense, imperfect self-defense and the defense of others did not apply in felony-murder cases.  Respondent argues that all of these claims are unexhausted and may not be considered by this court.  In the alternative, respondent contends that the claims should be denied on the merits pursuant to 28 U.S.C. § 2254(d)(2).

**1. Claims 1 and 2**

On appeal, petitioner argued that the trial court committed evidentiary error when it admitted into evidence the two "pay/owe sheets."  Answer, Ex. A at 23.  Specifically, petitioner claimed that the sheets "suffered from hearsay and foundational defects." *Id.*  This allegation corresponds to claim 1 in the instant petition.  In state court, petitioner contended that because the trial court's evidentiary ruling "allowed a prosecution expert witness to opine the paper scraps were a drug dealer's 'pay and owe sheets' and extrapolate that Godinez was a large scale drug dealer handling thousands of dollars in cash, it unfairly supplied the prosecution with a motive for the burglary and robbery charged as special circumstances." *Id.*  Petitioner's argument in this regard was based solely on state law regarding the rules of evidence. *Id.* at 23-39.  Petitioner did not cite federal law or articulate a federal constitutional claim. *Id.*  In its opinion rejecting petitioner's evidentiary claim, the California Court of Appeal cited only state

9

1  law.  Answer, Ex. H at 36-39.[8]

2      Petitioner subsequently filed a petition for review in the California Supreme Court, in

3  which he raised, for the first time, a claim that the state court's evidentiary ruling allowing into

4  evidence the "pay/owe sheets" violated the federal due process clause.  Answer, Ex. I. at 6.

5      On appeal in state court, petitioner also raised a claim that the trial court committed

6  evidentiary error when it admitted into evidence Joseph Cobb's statements to police.  Answer,

7  Ex. A at 40-50.  This argument corresponds to claim 2 in the instant petition.  Again, in state

8  court petitioner cited only state cases in support of this claim.  He argued that the trial court's

9  evidentiary ruling allowing Joseph Cobb's statements into evidence violated state rules regarding

10  the admissibility of evidence.  *Id.*[9]  In its opinion rejecting petitioner's evidentiary claim, the

11  California Court of Appeal did not cite federal law or address any federal constitutional issues.

12  Answer, Ex. H at 39-42.

13      Petitioner subsequently filed a petition for review in the California Supreme Court, in

14  which he raised, for the first time, a claim that the trial court's evidentiary ruling allowing into

15  evidence the statements of Joseph Cobb violated his federal due process rights.  Answer, Ex. I at

16  12-15.  The California Supreme Court summarily denied petitioner's petition for review.

17  Answer, Ex. J.

18  ////

19  ////

20

21      [8]  In his appellate brief, petitioner noted that he had filed a motion in limine in the trial

22  court "under state statutory and state and federal constitutional grounds" to exclude these two
   documents from evidence.  Answer, Ex. A at 23.  However, petitioner did not raise a federal
   constitutional argument on direct appeal.  The court notes, in this regard, that pages 38-39 are

23  missing from the relevant portion of petitioner's opening brief on appeal in all of the related
   cases filed in this court.  *See* Pet., Ex. A; Reynoso habeas, Answer, Ex. A; Cobb habeas, Answer,

24  Ex. C.  However, it appears from the pages that were filed that petitioner did not cite any federal
   cases or argue any federal constitutional claim in support of his evidentiary argument on appeal.

25

26      [9]  Petitioner cited federal cases only in support of his argument that the trial court's
   evidentiary error was prejudicial.  Answer, Ex. A at 50.

1        a. **Exhaustion**

2        Generally, a state prisoner must exhaust all available state court remedies either on direct

3    appeal or through collateral proceedings before a federal court may consider granting habeas

4    corpus relief.  28 U.S.C. § 2254(b)(1).  A state prisoner satisfies the exhaustion requirement by

5    fairly presenting his claim to the appropriate state courts at all appellate stages afforded under

6    state law.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Casey v. Moore*, 386 F.3d 896, 915-16 (9th

7    Cir. 2004), *cert. denied*, 125 S.Ct. 2975 (2005).

8        In *Castille v. Peoples*, 489 U.S. 346, 351 (1989), the United States Supreme Court held

9    that "where the [federal] claim has been presented for the first and only time in a procedural

10   context in which its merits will not be considered unless there are special and important reasons

11   . . . [r]aising the claim in such a fashion does not . . . constitute fair presentation."  The Ninth

12   Circuit has interpreted *Castille* to stand for the proposition that a petitioner fails to exhaust a

13   federal claim if she or he seeks review of the claim for the first time on discretionary appeal in

14   state court.  *Casey*, 386 F.3d at 918 (petitioner did not exhaust his federal claims where they

15   were raised for the first and only time in a discretionary petition for review to the Washington

16   State Supreme Court).

17       A petition for review to the California Supreme Court is a discretionary appeal.  *See* Cal.

18   Rules of Court, Rule 8.500(b).  Petitioner raised claims 1 and 2 for the first time in a

19   discretionary appeal to the California Supreme Court.  Accordingly, it appears that he has failed

20   to exhaust those claims for purposes of the federal habeas corpus statute.  *Castille*, 489 U.S. at

21   351; *Casey*, 386 F.3d at 918.  However, as set forth below, notwithstanding the exhaustion

22   requirement, this court will recommend that petitioner's claims 1 and 2 be denied on the merits.

23   *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the

24   merits, notwithstanding the failure of the applicant to exhaust the remedies available in the

25   courts of the State"); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court

26   considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly

                                          11

1  clear that the claim is not "colorable").[10]

2  **b.  Procedural Default**

3      When a state prisoner fails to exhaust his federal claims in state court and the state court

4  would now find the claims barred under applicable state rules, the exhaustion requirement is

5  satisfied, but the federal claims are procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722,

6  735 n.1 (1991); *Casey*, 386 F.3d at 920.  Similarly, if a federal constitutional claim is expressly

7  rejected by a state court on the basis of a state procedural rule that is independent of the federal

8  question and adequate to support the judgment, the claim is procedurally defaulted.  *Coleman*,

9  501 U.S. at 729-30; *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).  Habeas review of

10 procedurally defaulted claims is barred unless the petitioner demonstrates cause for the

11 procedural default and actual prejudice, or that the failure to consider the claims will result in a

12 miscarriage of justice.  *Coleman*, 501 U.S. at 750.  Respondent argues that petitioner's claims 1

13 and 2 are procedurally barred because "it is fair to assume" that the California Supreme Court

14 denied these two claims on procedural grounds.

15     As a policy matter, on petition for review the California Supreme Court normally "will

16 not consider" an issue that the petitioner failed to timely raise in the Court of Appeal.  Cal. Rules

17 of Court, Rule 8.500(c)(1).  As noted above, the California Supreme Court denied petitioner's

18 claims without opinion or citation to authority.  Accordingly, it is not possible to determine

19 whether, as argued by respondent, the claim was "denied" for procedural reasons or whether,

20 according to policy, the Supreme Court did not "consider" the claim at all.  This court will not

21 attempt to divine the reasons behind the state Supreme Court's summary rejection of petitioner's

22 claims, nor will it declare a procedural default where the state court has failed to indicate that a

23 claim has been rejected on procedural grounds.  In addition, a reviewing court need not

24 invariably resolve the question of procedural default prior to ruling on the merits of a claim

25

26      [10]  In order to be colorable, a claim must have both legal and factual support.  *Beaudry Motor Co. v. Abko Properties, Inc.*, 780 F.2d 751, 756 (9th Cir. 1986).

1  where the default issue turns on difficult questions of state law.  *Lambrix v. Singletary*, 520 U.S.

2  518, 524-25 (1997); *see also Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004).  Under the

3  circumstances presented here, this court finds that petitioner's claims 1 and 2 can be resolved

4  more easily by addressing them on the merits.  Accordingly, this court will assume that

5  petitioner's claims are not defaulted and will address them on the merits.

6                **2.  Claim 3**

7         On direct appeal, petitioner raised a claim that the cumulative effect of the two errors

8  alleged in claims 1 and 2 in the instant petition resulted in a "miscarriage of justice" and required

9  reversal of his convictions.  Answer, Ex. A at 54.  In support of this argument, petitioner cited

10  the dissenting opinion in *Harrington v. California*, 395 U.S. 250, 255-56 (1968) (opining that an

11  accumulation of errors may preclude a finding of harmless error) and *United States v. Frederick*,

12  78 F.3d 1370 (9th Cir. 1996) (finding that the cumulative effect of errors at the defendant's trial

13  was prejudicial, requiring reversal of his convictions).  The California Court of Appeal did not

14  specifically address this argument, finding instead that the trial court did not commit any error

15  when it admitted into evidence the "pay/owe sheets" and Joseph Cobb's statements to police.

16         Petitioner subsequently filed a petition for review in the California Supreme Court, in

17  which he argued that the accumulation of **all** of the errors at his trial violated his federal rights to

18  due process and a fair trial.  Answer, Ex. I at 24.  In claim 3 in the instant petition, petitioner

19  claims that the accumulation of only the two errors alleged in claims 1 and 2 violated his right to

20  a fair trial.  Pet. at 27-30.

21         Respondent claims that petitioner has failed to exhaust claim 3 in state court.  To satisfy

22  the exhaustion requirement, a petitioner is required to "fairly present" his federal claims in state

23  court "to give the State the opportunity to pass upon and correct alleged violations of its

24  prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*); *see also*

25  *Baldwin*, 541 U.S. at 29 (holding that, ordinarily, for a petitioner to "fairly present" federal

26  claims to a state court, the federal issues must be clearly identified in the state court brief).  As

described above, it appears that petitioner did not present to the California Supreme Court his claim that the accumulation of only the two errors described in claims 1 and 2 in the instant petition deprived him of his due process right to a fair trial.  Rather, he claimed that the accumulation of **all** of the errors at his trial violated his constitutional rights.  Although this may be a distinction without a difference, it appears that petitioner may not have exhausted claim 3 contained in the instant petition.  However, notwithstanding the exhaustion requirement, this court will recommend that petitioner's claim 3 be denied on the merits pursuant to 28 U.S.C. § 2254(b)(2).

### 3.  **Claim 5**

On direct appeal, petitioner joined in the claim made by his co-defendants that the trial court erroneously instructed the jury that the defenses of self-defense, imperfect self-defense and the defense of others did not apply in felony-murder cases.  Answer, Ex. A at 60.  This argument corresponds to claim 5 in the instant petition.  In state court, Cobb argued that this jury instruction violated his federal rights to due process and to be free from cruel and unusual punishment.  Answer filed in Cobb habeas, Ex. A at 72.  Reynoso argued that the jury instruction denied him the right to present a defense of self-defense, in violation of his Sixth and Fourteenth Amendment right to a fair trial.  Answer filed in Reynoso habeas, Ex. B at 31.

Respondent claims that petitioner has failed to exhaust claim 5 in state court.  In order to satisfy the exhaustion requirement, a petitioner must alert the state court that his claims rest on the federal Constitution.  *See Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (per curiam) (holding that, when the petitioner failed to cite federal case law or mention the federal Constitution in his state court briefing, he did not alert the state court to the federal nature of his claims).  A petitioner must also make reference to provisions of the federal Constitution or must cite either federal or state case law that engages in a federal constitutional analysis.  *See Lyons v. Crawford*, 232 F.3d 666, 670 (9th Cir. 2000) (holding that state-exhaustion requirements for a habeas claim are satisfied when a petitioner cites federal case law or provisions from the federal

1   constitution or statutes), *amended*, 247 F.3d 904 (9th Cir. 2001); *Peterson v. Lampert*, 319 F.3d

2   1153, 1157-58 (9th Cir. 2003) (en banc) (holding that a citation to a state court case that provides

3   a federal analysis can "serve[ ] the same purpose as a federal case analyzing such an issue").

4        The court concludes that petitioner exhausted claim 5 in state court.  As described above,

5   petitioner alleged as to this claim that the trial court's error deprived him of his federal

6   constitutional rights.  He cited to specific federal constitutional provisions and cited federal case

7   law.  Claim 5 was "fairly presented" to the state's highest court.  Accordingly, this court will

8   analyze the merits of claim 5.

9      **C.  Petitioner's Claims**

10        **1.  <u>Evidentiary Error</u>**

11           **a.  <u>Pay/Owe Sheets (Claim No. 1)</u>**

12        In claim No. 1, petitioner alleges that he was denied his constitutional rights to due

13   process and a fair trial when the trial court improperly admitted into evidence two scraps of

14   paper found in Godinez's apartment which purportedly showed "pay/owe" information regarding

15   drug transactions.  Pet. at 10-18.  Petitioner argues that the pay/owe sheets were inadmissible

16   because they were not properly authenticated and constituted inadmissible hearsay.  *Id.* at 10.

17   He also contends that the admission into evidence of these documents was prejudicial to

18   petitioner because it allowed the prosecution to argue that petitioner and his co-defendants had a

19   motive for the burglary and robbery.  *Id.* at 10-11.

20        As described above, petitioner did not raise on direct appeal a federal due process claim

21   in connection with the admission of the "pay/owe sheets."[11]  On petition for review, petitioner

22   claimed that the admission of this evidence violated his right to due process because it "allowed

23

24       [11]  Rather, he claimed that the admission of the "pay/owe sheets" violated state
evidentiary rules regarding authenticity and hearsay.  Answer, Ex. A at 23.  The California Court

25   of Appeal rejected these arguments, ruling that the sheets of paper were not hearsay because they
were not offered to prove the truth of the matters stated therein, and that the evidence was

26   properly authenticated.  Opinion at 36-39.

1    the prosecution expert witness to opine the paper scraps were a drug dealer's 'pay and owe

2    sheets,' and to further extrapolate that Godinez was a large scale drug dealer handling thousands

3    of dollars in cash, thereby unfairly supplying the prosecution with a motive for the burglary and

4    robbery charged as special circumstances."  Answer, Ex. I at 6.  Petitioner further argued that the

5    trial court's evidentiary ruling denied him "the structural order of a criminal trial in compliance

6    with fundamental notions of fairness and due process of law."  *Id.* at 10.

7       Absent some federal constitutional violation, a violation of state law does not provide a

8    basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).   Accordingly, a state

9    court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders

10    the state proceedings so fundamentally unfair as to violate due process.  *Drayden v.*

11    *White*, 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999);

12    *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

13       The "pay/owe sheets" which are the subject of petitioner's claim in this regard are

14    described above in the "factual background" section.  At petitioner's trial, an expert in

15    methamphetamine trafficking testified that he believed these documents were records of drug

16    transactions.  When the prosecution moved the documents into evidence, defendants

17    unsuccessfully objected on the ground that one of the documents had not been properly

18    authenticated.  Opinion at 36.  Petitioner now contends that the admission of this evidence

19    violated his right to a fair trial.

20       Petitioner has failed to demonstrate a federal due process violation under the facts of this

21    case.  As noted by the state appellate court:

22           Since there was no evidence that defendants had seen these
            documents, their only relevance was that Godinez was involved in

23           drug transactions.  But Reynoso separately testified that Godinez
            had "fronted" him (Reynoso) to sell methamphetamine with a

24           value of $20,000.  This certainly showed that Godinez was
            involved in the drug trade in a large way.  Further, . . .   Defendant

25           Cobb's brother, Joseph, told Detective Winton that Avila and
            Reynoso had talked about the fact that Godinez was selling drugs.

26           Thus, there was more than enough evidence that Godinez was

> selling drugs (or that defendants believed that he was) such that the
> two pay-owe sheets added little to the other evidence.

*Id.* at 39.  As the state appellate court recognized, the evidentiary value of the two sheets of

paper found in Godinez's residence was cumulative to other evidence at petitioner's trial

indicating that Godinez was a large scale drug dealer.  This court also notes that the "pay/owe

sheets" were only marginally relevant to petitioner in any event because the issue at trial was not

whether Godinez was a drug dealer, but whether petitioner and his co-defendants believed that

he was.  The "pay/owe sheets" may have provided evidence that Godinez was involved in selling

drugs, but they had no bearing on whether petitioner and his co-defendants knew this.  For these

reasons, the admission of this evidence, even if erroneous under state law, could not have had

"substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

*Abrahamson*, 507 U.S. 619, 637 (1993) (habeas petitioners are not entitled to habeas relief based

on trial error unless they can establish that the error resulted in "actual prejudice").  Because

petitioner has failed to demonstrate that admission of the "pay/owe sheets" rendered his trial

fundamentally unfair, he is not entitled to relief on this claim.

### b.  Statements of Joseph Cobb (Claim No. 2)

Petitioner's next claim is that he was denied his constitutional rights to due process and a

fair trial when the trial judge admitted into evidence Joseph Cobb's statements to police to the

effect that petitioner and his co-defendants knew Godinez was a drug dealer with a large amount

of cash, and when he instructed the jury that it could use those statements to determine

petitioner's motive.

The California Court of Appeal rejected this claim in a reasoned decision.  That court

summarized the relevant facts and explained its reasoning as follows:

> A portion of the videotaped statement made to police by Joseph
> Cobb – defendant Cobb's brother – was played to impeach
> Joseph's trial testimony that he had never heard defendants discuss
> Godinez, or the fact that Godinez was selling drugs or "balling."
> During his taped exchange with Detective Winton, however,
> Joseph had stated that "they" told him Godinez was selling drugs

17

and had money.

Over defendants' objection, the trial court instructed the jury that it could consider Joseph's statement for the purpose of drawing an inference regarding the state of mind of the persons referred to as "they."

Avila contends that "the statement provided the only other evidence from which the jury could have drawn the inference that [defendant's] motive in going to Godinez's house was to rob him" and that "there was an insufficient foundational basis to sustain a finding that [defendant] was the person who gossiped about Godinez, or that [defendant] heard this gossip and 'adopted' it." He argues that nowhere "does Winton or Joseph Cobb define or name who the 'they' were that this conversation referred to." Defendant Reynoso joins in this argument.

After reviewing with care the videotape of Joseph's interview with Detective Winton, we disagree with defendants' argument. Although some portions are hard to hear, the following exchange is clearly audible.[12]

"WINTON:  You think David [Reynoso] and Cruz [Avila] would go out and do something like this on their own?  Think of this whole thing by themselves?  Have no contact with anybody else about it?

"JOSEPH:  Well, you know, [unintelligible] *they* probably told me about it before, but not that night.

"WINTON:  What would *they* have told you before.

"JOSEPH:  I don't know.  [Unintelligible.]

"WINTON:  What did they tell you, Joe?

"JOSEPH:  *Just talk about Nick.*

"WINTON:  What about Nick?

"JOSEPH:  You know, just, he was, I guess, he was balling or whatever . . . .

"JOSEPH:  In don't know, you know, I knew Nick, *they just told me he was selling drugs* and that was it.  He was big and shit.

"WINTON:  He was big into meth?

---

[12]  The parties stipulated that the court reporter did not have to transcribe the tape as it played, and no transcript of this tape was introduced into evidence.

18

"JOSEPH:  I believe so.

"WINTON:  When, when were *they* talking to you about that?

"JOSEPH:  A while ago, when we were kicking at Fred's house or whatever.  'He's balling,' you know what I'm saying?

"WINTON:  Come on, Joe . . . .

"WINTON:  [Unintelligible.]  *Did Kristina say he was dealing?*

"JOSEPH:  *Yeah.*  She told Gume and everything when we were there."  (Italics added.)

Accordingly, it is clear that Detective Winton was questioning Joseph about Reynoso and Avila, and that Joseph's reference to "they" referred to "them."  Defendants' assignment of error is wholly based upon their mistaken assertion that Detective Winton did not preface his questioning of Joseph by asking, "You think David and Cruz would go out and do something like that on their own?"

But a close review of the videotape reveals that Detective Winton prefaced this line of questioning with an express reference to defendants Avila and Reynoso.  We presume this fact was also clear to the trial court and jurors.

Moreover, Joseph admitted at trial that he understood Detective Winton was talking about Reynoso and Cruz:

"Q.  (By [the prosecutor]):  You understood, didn't you, Mr. Cobb, that Mr. Winton was – Detective Winton was talking to you about David Reynoso and about Cruz Avila, correct?

"A.  Guess so."

Under the circumstances, the jurors were entitled to conclude that Avila and Reynoso were the "they" of whom Winton and Joseph spoke during their ensuing two-minute exchange.  Defendants' contention to the contrary has no merit.

Opinion at 39-42.

In the petition before this court, petitioner argues that the statements made by Joseph Cobb were inadmissible because there was insufficient evidence that petitioner "made the statement that Godinez was 'balling,' or accepted it as an adoptive admission when someone else uttered the statement in front of him."  Pet. at 24.

1        This court has carefully reviewed those portions of the state court record that are relevant

2   to this claim.  When asked at trial about his use of the word "they" during his conversation with

3   Detective Winton, Joseph Cobb gave the following answers:

4           Q.  (By Mr. Johnson (the prosecutor)):  You understood, didn't
            you, Mr. Cobb, that Mr. Winton was – Detective Winton was
5           talking to you about David Reynoso and about Cruz Avila,
            correct?
6
            A.  Guess so.
7
            Q.  When you were using the word "they" were you referring to
8           Cruz and David?

9           A.  I was referring to the people who we were talking with.  Says
            that, you know, we would kick it at Fred's.  There was a lot of
10          people there.

11  Reporter's Transcript on Appeal (RT) at 1474.

12          Q:  You said on the tape that "they" just told me he was selling
            drugs.
13
            A.  Ahum.
14
            Q.  Who were you talking about when you say "they"?
15
            A.  People who I was having conversations with.
16
            Q.  At Fred's house?
17
            A.  Yes.
18
            Q.  Who is "they"?
19
            A.  There was a lot of people there.  I mean, you know, everyone
20          has – everyone says things.  I can't remember.

21  *Id.* at 1476.[13]  Joseph Cobb also testified that he was present, along with petitioner, Avila, and

22  others during conversations about Godinez.  *Id.* at 1474-1476.  Cobb also acknowledged at trial

23  that he told Detective Winton that Kristina told her friend Gumecinda in front of a group that

24

25          [13]  During a conversation about the admissibility of the tape recording of Joseph Cobb's
     police interview, the trial judge found that Joseph Cobb was "being deliberately evasive" with
     regard to the meaning of the word "they" and/or whether Joseph Cobb had heard petitioner or
26   Avila discussing the fact that Godinez was a successful drug dealer.  *Id.* at 1481.

1   included petitioner and Avila that Godinez was dealing drugs.  *Id.* at 1484-87.

2          Petitioner disputes the appellate court's factual finding that immediately before using the

3   pronoun "they" Detective Winton was asking Joseph Cobb specifically about petitioner and co-

4   defendant Avila.  As set forth above, the state appellate court found, after reviewing "with care"

5   the videotape of Joseph Cobb's interview with Detective Winton, that the conversation on the

6   videotape began with the following questions by the detective:  "Winton:  You think David

7   [Reynoso] and Cruz [Avila] would go out and do something like this on their own?  Think of this

8   whole thing by themselves?  Have no contact with anybody else about it?"  Opinion at 40-41.

9   Petitioner, on the other hand, states that the conversation started out with the following remarks:

10  "Winton:  They did this whole thing by themselves?"  Pet. at 20.  This court has also reviewed

11  the videotape of Joseph Cobb's statements, lodged by respondent as part of the record in this

12  case.  In this court's copy of the videotape, the interview begins in the middle of a sentence, as

13  follows:  "Winton:  . . . something like this on their own?  Think of this whole thing by

14  themselves?"  In other words, the detective's mention of "David" and "Cruz" would have come

15  before the recorded conversation on this court's copy of the videotape.  However, the remainder

16  of the conversation on the court's videotape corresponds to the interview as set forth by the

17  California Court of Appeal.  Petitioner's version of the first sentence of the interrogation does

18  not correspond to the language of the interview on the court's tape.

19         The state court found that Detective Winton mentioned petitioner and Reynoso by name

20  before he referred to them as "they."  Petitioner disputes this.  However, in a habeas corpus

21  proceeding, a determination of a factual issue made by the state court shall be presumed correct.

22  28 U.S.C. § 2254(e)(1).  Petitioner has the burden of rebutting this presumption of correctness by

23  "clear and convincing evidence."  *Id.*  Petitioner has failed to do so.  He has simply suggested a

24  dialogue which is not contained anywhere in the record before this court.  Therefore, the court

25  will accept the factual determination by the state court that, before asking Joseph Cobb about

26  "they," Detective Winton made specific mention of petitioner and co-defendant Reynoso.  When

1    read in its entirety, the exchange between Detective Winton and Joseph Cobb makes clear that

2    Joseph Cobb was referring to petitioner and Reynoso when he said that "they" told Cobb that

3    Godinez was selling drugs and was "big."  In addition, contrary to petitioner's claim, Joseph

4    Cobb did not testify at trial that "they" referred to persons other than petitioner and Reynoso.

5    Rather, he testified that "they" may have included persons in addition to petitioner and Reynoso.

6            The trial court's decision to admit into evidence the transcript of Joseph Cobb's

7    interrogation and to instruct the jury that the interrogation was relevant to show the state of mind

8    of the persons referred to as "they" did not render petitioner's trial fundamentally unfair.  Upon

9    review of the record, the meaning of Joseph Cobb's reference to "they" was clear from the

10   context.  It is apparent from the record that Joseph Cobb discussed with petitioner and Reynoso,

11   and possibly others as well, that Godinez was a successful drug dealer, a fact relevant to the

12   motive for this murder.[14]  Petitioner's claim, which is based on an incorrect or incomplete

13   reading of the conversation between Detective Winton and Joseph Cobb and Cobb's trial

14   testimony, lacks merit, is not colorable, and must be denied.

15                        **2.  Cumulative Error (claim No. 3)**

16           Petitioner's third claim is that the cumulative impact of the errors alleged in claims 1 and

17   2 violated his due process right to a fair trial.  Pet. at 27.

18           The Due Process Clause of the Fourteenth Amendment encompasses the right to a fair

19   trial.  *In re Murchison*, 349 U.S. 133, 136 (1955).  However, as the United States Supreme Court

20   stated in *Rose v. Clark*:

21               The thrust of the many constitutional rules governing the conduct
                 of criminal trials is to ensure that those trials lead to fair and
22               correct judgments.  Where a reviewing court can find that the
                 record developed at trial establishes guilt beyond a reasonable
23               doubt, the interest in fairness has been satisfied and the judgment

24
         [14]  The court also notes that co-defendant Reynoso testified that Godinez loaned him a
25   substantial amount of money in order to finance a drug transaction.  As noted by the California
     Court of Appeal, this evidence "certainly showed that Godinez was involved in the drug trade in
26   a large way" and that Reynoso knew he was so involved.  Opinion at 39.

1    should be affirmed.  As we have repeatedly stated, "*the*
2    *Constitution entitles a criminal defendant to a fair trial, not a*
     *perfect one.*"

3    478 U.S. 570, 579 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986))

4    (emphasis added).

5        This court has addressed both of the claims alleged to have caused prejudicial cumulative

6    error and concludes that they did not render petitioner's trial fundamentally unfair, either

7    individually or in the aggregate.  For that reason alone this "cumulative" claim fails.  Moreover,

8    the United States Supreme Court has not articulated a claim of "cumulative error."[15]

9    Accordingly, any decision by the California courts with respect to this claim is not contrary to or

10   an unreasonable application of federal law as determined by the United States Supreme Court.

11   *See Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004) (state court's decision not contrary

12   to federal law where no United States Supreme Court precedent exists).  Petitioner is not entitled

13   to relief on this claim.

14                    **3.  <u>Sufficiency of the Evidence (claim No. 4)</u>**

15        In claim No. 4, petitioner claims that the jury improperly found the two special

16   circumstance allegations true.  Specifically, he claims that the evidence was insufficient to

17   support the jury finding that he acted with reckless indifference to human life.  Petitioner notes

18   that he was not the person who shot Godinez.  He explains that co-defendant Cobb shot Godinez

19   in defense of co-defendant Reynoso.  Pet. at 31.  Petitioner argues, "the facts show Cobb acted

20   spontaneously after it was clear that Godinez was going to kill Reynoso."  *Id.*  He notes that "all

21   defendants then fled leaving two unwounded bystanders to care for Godinez."  *Id.*

22        This claim was rejected by the California Court of Appeal which set forth in detail

23   substantial evidence supporting the jury's findings of reckless in difference with the following

24   _____

25        [15]  The Ninth Circuit Court of Appeals has stated that where "no single trial error
     examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of
     multiple errors may still prejudice a defendant."  *United States v. Frederick*, 78 F.3d 1370, 1381
26   (9th Cir.1996).  *See also Karis v. Calderon*,  283 F.3d 1117, 1132 (9th Cir. 2002).

                                        23

reasoning:

> The circumstances in which an accomplice to felony murder may
> be subjected to life imprisonment without the possibility of parole,
> which requires a "reckless indifference to human life," are defined
> in section 190.2, subdivision (d): "[E]very person, not the actual
> killer, who, with reckless indifference to human life and as a major
> participant, aids, abets, counsels, commands, induces, solicits,
> requests, or assists in the commission of a felony enumerated in
> paragraph (17) of subdivision (a) which results in the death of
> some person or persons, and who is found guilty of murder in the
> first degree therefor, shall be punished by death or imprisonment in
> the state prison for life without the possibility of parole if a special
> circumstance enumerated in paragraph (17) of subdivision (a) has
> been found to be true . . . ." Among the special circumstances
> enumerated in subdivision (a), paragraph 17, are that the murder
> was committed while the defendant was an accomplice in the
> commission or attempted commission of first degree robbery
> (§190.2, subd. (a)(17)(A) or first degree burglary (190.2, subd.
> (a)(17)(G).)

> Defendants do not dispute that they were "major participants"
> within the meaning of §190.2, subdivision (d). Rather, they argue
> that "merely committing an armed burglary or robbery should not
> be sufficient to infer a defendant acted with reckless indifference
> to life."

> The portion of the relevant statutory language in section 190.2,
> subdivision (d), is derived verbatim from the United States
> Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137
> [95 L.Ed.2d 127] (*Tison*). "In *Tison*, the court held that the Eighth
> Amendment does not prohibit as disproportionate the imposition of
> the death penalty on a defendant convicted of first degree felony
> murder who was a 'major participant' in the underlying felony, and
> whose mental state is one of 'reckless indifference to human life.'
> (*Tison*, *supra*, 481 U.S. at p. 158, fn. 12 [95 L.Ed.2d at pp. 144-
> 145].) The incorporation of *Tison's* rule into section 190.2(d) – in
> express terms – brought state capital sentencing law into
> conformity with prevailing Eighth Amendment doctrine.
> [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 575.)

> The defendants in *Tison* were two brothers who "orchestrated the
> prison escape of their father and his cellmate, arming themselves, a
> third brother, and the two convicted murderers with guns while
> still inside prison walls, and assisting in the escapees' flight after
> the breakout. When a tire on the group's getaway car went flat on
> the highway, one of the defendants flagged down a passing
> motorist for help. Both of the defendants participated in the
> kidnapping and robbery of the occupants of the stopped vehicle,
> and were nearby when their father and his cellmate shot and killed
> the four victims." (*People v. Estrada, supra*, 11 Cal.4th at p. 576,

24

citing *Tison, supra*, 481 U.S. at pp. 139-141 [95 L.Ed.2d at pp. 132-134[.)

The Court in *Tison* reasoned that "some nonintentional murderers may be among the most dangerous and inhumane of all – the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.  This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.'"  (*Tison, supra,* 481 U.S. at p. 157 [95 L.Ed.2d at p. 144].)  Thus, "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state."  (*Id.* at p. 157 [95 L.Ed.2d at p. 144].)

Following *Tison*, California courts have concluded that a defendant may be said to act with "reckless indifference to life" within the meaning of section 190.2, subdivision (d), if he "'knowingly engag[es] in criminal activities known to carry a grave risk of death' (citation)."  (*People v. Estrada, supra,* 11 Cal.4th at p. 577.)  In *People v. Estrada, supra,* 11 Cal.4th at p. 578, our Supreme Court made clear that "reckless indifference to human life" as used in section 190.2, subdivision (d), means the "defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony."

Substantial evidence established that Avila and Reynoso were subjectively aware of the grave risk to human life created by their participation in the underlying felony:  Believing Godinez to be a drug dealer, they sought to rob him; they armed themselves; each joined his armed companions in the invasion of Godinez's home in the middle of the night; one of them threatened Mayorga or Godinez to "[f]ucken lay down, or I'm going to fucken spray your ass"; Avila kicked in Godinez's front door for the purpose of stealing drugs or money; and after Godinez was shot, they left Godinez to bleed to death from his wounds and did not call for help.

Moreover, if defendants believed that Godinez had enough drugs and money worth stealing, they must have appreciated that Godinez would likely be armed and willing to defend himself, increasing the likelihood of gunfire in which an innocent person might be killed.  (*See Tison, supra*, 481 U.S. at pp. 150-151 [95 L.Ed.2d at p. 140] ["Participants in violent felonies like armed robberies can frequently 'anticipat[e] that lethal force . . . might be used . . . in accomplishing the underlying felony'"]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 ["[d]efendant admitted planning to go to a drug dealer's home at night to rob him . . . .  Defendant had to be aware of the risk of resistance to such an

25

armed invasion of the home and the extreme likelihood death could result"].)

Defendants argue that "the sudden invasion in the present case by three men would decrease the likelihood of resistance because of the overwhelming use of force" and that "the entry into a home suddenly, as in this case, with guns ready can decrease the risk of death as is a common reason police officers enter houses in this fashion."

To the contrary, that defendants embarked upon this home-invasion-style robbery attempt in the middle of the night increased the likelihood of confusion; the darkness made it more likely that an innocent person would be hurt, including Kristina (whom defendants knew) and her daughter.  Defendants cannot compare the risks associated with the illegal use of force with the police's legal exercise of force; there are rules of engagement that reduce the necessary risk of casualties from police work that are not observed by criminals, and the police have special training that defendants do not suggest they had.  Defendants' armed surprise invasion of a residence in the middle of the night of someone who they had to suspect would be armed created a grave risk.

The case law also suggests that the defendants' failure to come to Godinez's aid after the shooting supports the conclusion that they acted with reckless indifference to life.  (*See Tison, supra,* 481 U.S. at p. 152 [95 L.Ed.2d at pp. 140-141] [defendant Ricky Tison "watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims"]; *People v. Mora, supra,* 39 Cal.App.4th at p. 617 [defendant "did not attempt to aid the victim but instead carried through with the original plan to steal the victim's drugs].)

Evidence at trial established that Godinez lived for a while after the shooting, and that he may also have been able to walk.  From this, the jury could reasonably have concluded that had defendants helped Godinez or called for help instead of running away, Godinez might not have died.  Defendants' flight and failure to aid Godinez provide additional evidence that they were recklessly indifferent to whether he lived or died.[16]

Reynoso contends that "[t]he circumstances of leaving the victim dying is different in the present case because it is undisputed both Reynoso and Avila were seriously wounded and immediately went

---

[16]  Several cases focus for their analysis of whether a defendant acted with reckless indifference to life upon his willingness to take the money and run, leaving an injured victim in his wake.  (citations omitted.)  However, these cases do not suggest (as defendants argue) that a defendant who *leaves* the money and runs cannot be found to have acted with a reckless indifference to life.

to the hospital." But their reckless disregard for the life of Godinez is reflected in their false statements and refusal to cooperate with the police about what had happened, instead of advising police of the wounded victim.

In sum, substantial evidence supports the jury's finding that Avila and Reynoso acted with reckless indifference to human life.

Opinion at 46-51. That conclusion is well established by this record.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364. There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See also Prantil*, 843 F.2d at 316. "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.*

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985), *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994). The

27

1    relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

2    the jury could reasonably arrive at its verdict.  *United States v. Mares*, 940 F.2d 455, 458 (9th

3    Cir. 1991).  "The question is not whether we are personally convinced beyond a reasonable

4    doubt.  It is whether rational jurors could reach the conclusion that these jurors reached."

5    *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines the

6    sufficiency of the evidence in reference to the substantive elements of the criminal offense as

7    defined by state law.  *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

8         The decision of the California Court of Appeal that sufficient evidence supported the

9    jury's finding that petitioner acted with reckless indifference to human life is not unreasonable

10   and may not be set aside.  As noted by the state appellate court, petitioner invaded Godinez's

11   home armed with a gun, knowing that Godinez was probably armed and would attempt to defend

12   himself.  Under those circumstances, it was extremely likely that someone would be injured or

13   killed.  Indeed, it is difficult to think of a situation more fraught with danger.  Petitioner has

14   failed to demonstrate that the decision of the state court was contrary to or an unreasonable

15   application of federal law.  Accordingly, petitioner is not entitled to relief on this claim.

16            **4. Jury Instruction Error (claim No. 5)**

17        In claim No. 5, petitioner asserts that he was denied his constitutional rights "to a fair

18   trial, due process, and to be free from cruel and unusual punishment" when his jury was

19   instructed that the defenses of self-defense, unreasonable belief in self-defense, or the defense of

20   others, did not apply in determining the felony murder special circumstances.  Pet. at 32.

21   Petitioner concedes that a jury instruction on self-defense is not applicable to a charge of felony-

22   murder because malice is imputed to persons who commit homicide during the perpetration of a

23   dangerous felony.  *Id.* at 33.  However, he claims that the instruction should have been given

24   with respect to the underlying robbery and burglary special circumstance allegations because

25   those crimes require a showing that the defendant harbored a mental state of reckless

26   indifference to human life, which is tantamount to implied malice.  *Id.*  Petitioner notes that he

1    was not the person who fired the fatal shots at the victim and argues that "the killing was done as

2    a spontaneous act and as a direct result of Cobb's perception that if he did not act and fire his

3    weapon that his good friend, Godinez (sic), who had already been fired at by decedent, would be

4    killed." *Id.* at 32. Petitioner contends that unlike the actual killer, the state of mind of a major

5    participant in the underlying felony must exhibit reckless indifference to human life. *Id.* at 33.

6            Petitioner's jury received the following instructions:

7            The unlawful killing of a human being, whether intentional,
             unintentional or accidental, which occurs during the commission or
8            attempted commission of the crime of burglary or robbery is
             murder of the first degree when the perpetrator had the specific
9            intent to commit that crime.

10   CT at 460.

11           If you find a defendant in this case guilty of murder of the first
             degree, you must then determine if one or more of the following
12           special circumstances is true or not true: 1. that the murder was
             committed by defendants while engaged in the crime of burglary
13           (Penal Code § 190.2(a)(17)(vii)) or 2. that the murder was
             committed by defendants while engaged in the commission or
14           attempted commission of a robbery.

15           If you find that a defendant was not the actual killer of a human
             being, or if you are unable to decide whether the defendant was the
16           actual killer or an aider and abettor, you cannot find the special
             circumstance to be true as to that defendant unless you are satisfied
17           beyond a reasonable doubt that such defendant with the intent to
             kill aided, abetted, counseled, commanded, induced, solicited,
18           requested, or assisted any actor in the commission of the murder in
             the first degree, or with reckless indifference to human life and as a
19           major participant, aided, abetted, counseled, commanded, induced,
             solicited, requested, or assisted in the commission of the crime of
20           burglary, robbery, or attempted robbery which resulted in the death
             of a human being, namely Nicholas Godinez.

21

22   *Id.* at 478.

23           The special circumstance referred to in these instructions is not
             established if the burglary, robbery or attempted robbery was
24           merely incidental to the commission of the murder.

25   *Id.* at 481.

26   ////

> The concepts of lawful self-defense, lawful defense of others and mitigation of homicide due to an actual but unreasonable belief in the need to defend oneself do not apply if you should find that an unlawful killing was committed during the course of the commission of a felony such as burglary, robbery or attempted robbery. Those defenses only apply in cases of homicide allegedly committed on a theory other than by way of the felony-murder doctrine.

*Id.* at 474.

In his state court appeal, petitioner argued that the trial court erred in informing the jury that the instruction on self-defense did not apply to the charge of felony murder because "self-defense could affect whether the robbery or burglary was incidental to the murder." Opinion at 58.[17] The California Court of Appeal rejected this argument with the following reasoning:

> To the contrary, self-defense could not affect whether the robbery or burglary was incidental to the murder: Even if the decision to commit an armed burglary or robbery resulted in a homicide owing to the victim's excessive resistance (thus purportedly invoking the theory of self-defense), the killing would still be incidental to the commission of the burglary or robbery.

*Id.*

Petitioner also argued on appeal that "the jurors should have been instructed that they could consider the application of the self-defense and defense-of-others theories for the limited purpose of 'mitigating' the mental state required for a finding of special circumstances by 'negat[ing] the conclusion [that] a person who kills, even during the commission of a felony, acts in reckless disregard of human life." *Id.* The state appellate court rejected that argument as follows:

> But defendants' reckless indifference to life within the meaning of section 190.2, subdivision (d), could not be mitigated simply because they "defended" against the victim's resistance to their felonies. After all, such a defense would not alter the fact that

---

[17] This specific argument was articulated in co-defendant Reynoso's appellate brief. Opinion at 58. As explained above, petitioner joined in this argument on appeal. Answer, Ex. A at 60.

1
2
3
4
5
6

      defendants arrived at the residence armed and with the intent to commit felonies, that Avila kicked down the front door, and that they left Godinez to bleed to death from his wounds.  This showed a reckless indifference to life, regardless of whether the victim resisted their attempted felonies with deadly force.  Further, a person does not have the right to provoke an armed quarrel and then assert self-defense to justify a homicide, unless he or she has first, in good faith, declined further combat and fairly notified the opponent that he or she had abandoned the affray.  (*People v. Holt, supra,* 25 Cal.2d at p. 66.)  And there was no evidence of that.

7   *Id.* at 59.  The appellate court also noted that "there is no statutory or case authority for

8   [petitioner's] contention, while there is some authority to the contrary."  *Id.*

9         In general, a challenge to jury instructions does not state a federal constitutional claim.

10  *See Middleton* v. *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S.

11  107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant

12  federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or

13  even "universally condemned,"' but must violate some due process right guaranteed by the

14  fourteenth amendment."  *Prantil.*, 843 F.2d at 317 (quoting *Cupp v. Naughten*, 414 U.S. 141,

15  146 (1973)).  To prevail on such a claim, petitioner must demonstrate "that an erroneous

16  instruction 'so infected the entire trial that the resulting conviction violates due process.'"

17  *Prantil*, 843 F.2d at 317 (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In

18  making its determination, this court must evaluate the challenged jury instructions "'in the

19  context of the overall charge to the jury as a component of the entire trial process.'"  *Id.* (quoting

20  *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).

21        The decision of the California Court of Appeal rejecting petitioner's jury instruction

22  claim is not an unreasonable application of the federal due process principles set forth above.

23  Petitioner has not cited any United States Supreme Court case holding that the failure of a state

24  trial court to instruct a jury that the defense of self-defense is applicable to a charge of felony-

25  murder, or the special circumstance allegations attached thereto, violates a defendant's right to

26  due process.  Further, as explained by the state appellate court, even if petitioner and his co-

1  defendants acted to protect themselves (i.e., in "self-defense") in response to Godinez's actions,

2  the jury could still find that the shooting was committed while petitioner and his co-defendants

3  were engaged in the crimes of burglary or robbery and that they acted with reckless disregard for

4  human life at the point when they stormed Godinez's house armed with loaded weapons.  In fact,

5  the motivation for the shooting in this case is largely irrelevant to the charge of felony murder,

6  especially when petitioner and his co-defendants created the dangerous situation in the first

7  place.  Under the circumstances of this case, the trial court's instruction that the defense of self-

8  defense did not apply to the charge of felony-murder did not render petitioner's trial

9  fundamentally unfair or otherwise violate his constitutional rights.  Accordingly, petitioner is not

10  entitled to relief on this claim.

11              **5.  Cruel and Unusual Punishment (claim No. 6)**

12          Petitioner's next claim is that his sentence of life without the possibility of parole

13  constitutes cruel and unusual punishment because it was disproportionate to his actual

14  participation in the offenses.  Petitioner notes that he had no prior criminal record and was only

15  20 years old at the time of Godinez's murder.  He also contends that he was not in the house

16  when the shooting occurred and that the gun he carried was "not able to be fired."  Pet. at 34.

17  Petitioner raised this claim for the first time on appeal in state court.  The California Court of

18  Appeal rejected the claim, reasoning as follows:

19              Avila's federal constitutional claim is that his sentence violates the
               Eighth Amendment.
20
               However, in *Harmelin v. Michigan* (1991) 501 U.S. 957 [115
21             L.Ed.2d 836] (*Harmelin*), a life sentence without possibility of
               parole for possessing 672 grams of cocaine was upheld.  In a
22             fractured decision, two justices rejected any proportionality
               review, and three additional justices only supported a narrow
23             proportionality review.  The latter three justices stated:  "[T]he
               Eighth Amendment does not require strict proportionality between
24             crime and sentence.  Rather, it forbids only extreme sentences that
               are 'grossly disproportionate' to the crime."  (*Id.* at p. 1001 [115
25             L.Ed.2d at p. 869].)

26  ////

1
2
3
4
5
6
7
8
9

> We do not believe that Avila's sentence is grossly disproportionate to the crime of murder committed in connection with an armed burglary and a home-invasion-type, attempted robbery of an occupied residence. The United States Supreme Court has upheld, against an Eighth Amendment challenge, a life sentence imposed pursuant to a Texas recidivist statute upon a defendant convicted, successively, of fraudulent use of a credit card in the amount of $80, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses. (*Rummel v. Estelle* (1980) 445 U.S. 263 [63 L.Ed.2d 382].) And it has rejected an Eighth Amendment challenge to a prison term of 40 years and a fine of $20,000 for possession and distribution of approximately nine ounces of marijuana. (*Hutto v. Davis* (1982) 454 U.S. 370 [70 L.Ed.2d 556].)
>
> Based on these precedents, Avila's Eighth Amendment claim must fail.

10    Opinion at 66-67.

11         The United States Supreme Court has held that the Eighth Amendment includes a

12    "narrow proportionality principle" that applies to terms of imprisonment. *See Harmelin v.*

13    *Michigan*, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring). *See also Taylor v. Lewis*, 460

14    F.3d 1093, 1097 (9th Cir. 2006). However, as the state court observed, successful challenges in

15    federal court to the proportionality of particular sentences are "exceedingly rare." *Solem v.*

16    *Helm*, 463 U.S. 277, 289-90 (1983). *See also Ramirez v. Castro*, 365 F.3d 755, 775 (9th Cir.

17    2004). "The Eighth Amendment does not require strict proportionality between crime and

18    sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the

19    crime." *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring) (citing *Solem v. Helm*). In

20    *Lockyer v. Andrade*, the United States Supreme Court found that in addressing an Eighth

21    Amendment challenge to a prison sentence, the "only relevant clearly established law amenable

22    to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality

23    principle, the precise contours of which are unclear and applicable only in the 'exceedingly rare'

24    and 'extreme' case." 538 U.S. at 73 (*citing Harmelin*, 501 U.S. 957; *Solem*, 463 U.S. 277; and

25    *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)). In that case, the United States Supreme Court

26    held that it was not an unreasonable application of clearly established federal law for the

California Court of Appeal to affirm a "Three Strikes" sentence of two consecutive 25 year-to-

life imprisonment terms for a petty theft with a prior conviction involving theft of $150.00 worth

of videotapes. *Andrade*, 538 U.S. at 75; *see also Ewing v. California*, 538 U.S. 11, 29 (2003)

(holding that a "Three Strikes" sentence of 25 years-to-life in prison imposed on a grand theft

conviction involving the theft of three golf clubs from a pro shop was not grossly

disproportionate and did not violate the Eighth Amendment).

In assessing the compliance of a non-capital sentence with the proportionality principle, a

reviewing court must consider "objective factors" to the extent possible. *Solem*, 463 U.S. at 290.

Foremost among these factors are the severity of the penalty imposed and the gravity of the

offense. "Comparisons among offenses can be made in light of, among other things, the harm

caused or threatened to the victim or society, the culpability of the offender, and the absolute

magnitude of the crime." *Taylor*, 460 F.3d at 1098.[18]

The court finds that petitioner's sentence does not fall within the type of "exceedingly

rare" circumstance that would support a finding that his sentence violates the Eighth

Amendment.  Petitioner's sentence of life without parole is certainly an extremely harsh penalty.

However, petitioner's crime was also extremely serious: petitioner and his co-defendants armed

---

[18] As noted in *Taylor*, the Supreme Court has also suggested that reviewing courts compare the sentences imposed on other criminals in the same jurisdiction, and also compare the sentences imposed for commission of the same crime in other jurisdictions. 460 F.3d at 1098 n.7. However,

. . . consideration of comparative factors may be unnecessary; the *Solem* Court "did not announce a rigid three-part test." *See Harmelin*, 501 U.S. at 1004, 111 S.Ct. 2680 (Kennedy, J., concurring). Rather, "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1004-05, 111 S.Ct. 2680; see also *Rummel v. Estelle*, 445 U.S. 263, 282, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) ("Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State.").

*Id.*

themselves with guns and committed a premeditated home-invasion robbery which, not surprisingly, resulted in the shooting death of a person in the home.  Although petitioner asserts that his participation was minor, the sentencing court found that petitioner and his co-defendants premeditated the robbery, that petitioner kicked the door down, and that petitioner arrived at the victim's house with a fully loaded gun.  RT at 2327.  In *Harmelin*, the petitioner received a sentence of life without the possibility of parole for possessing 672 grams of cocaine.  In light of the *Harmelin* decision, as well as the decisions in *Andrade* and *Ewing*, which imposed sentences of twenty-five years to life for petty theft convictions, a life sentence without the possibility of parole for first degree murder committed during the course of an armed robbery is not grossly disproportionate.  Because petitioner does not raise an inference of gross disproportionality, this court need not compare petitioner's sentence to the sentences of other defendants in other jurisdictions.  This is not a case where "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."  *Solem*, 463 U.S. at 1004-05. The state court's reliance on *Harmelin* and its determination that petitioner's sentence did not violate the Eighth Amendment was not an unreasonable application of the Supreme Court's proportionality standard.  Accordingly, this claim for relief should be denied.

### 6.  <u>Prosecutorial Misconduct (claim No. 7)</u>

Petitioner alleges that he was denied his constitutional right to a fair trial when the prosecutor committed misconduct during closing argument.  Pet. at 38-39.  Specifically, petitioner argues that, despite his promise not to do so, the prosecutor improperly pointed out to the jury that co-defendant Reynoso had not testified to the same story his trial counsel had described in his opening argument.  *Id.*  Put another way, petitioner alleges that the prosecutor improperly highlighted the fact that Reynoso's story had changed during the course of the trial. The California Court of Appeal explained the relevant background to this claim as follows:

> In his opening statement, Reynoso's attorney indicated that the evidence would show that Godinez summoned Reynoso to his house on the night of the murder.  Although Reynoso "wasn't sure

exactly" why Godinez wanted to talk to him, he anticipated a "problem," and he had some ideas or theories about what the problem could be.  Reynoso's attorney then mentioned Reynoso's "prior relationship with [Kristina] Ramirez" and the fact that Reynoso and Kristina had recently encountered each other in social situations – although he did not say Reynoso believed that his prior relationship with Kristina was the source of his problem with Godinez.  Reynoso's attorney said that the evidence would show that even after Reynoso arrived at Godinez's house and saw that

Godinez was angry with him, Reynoso did not know why Godinez was upset.

However, Reynoso subsequently testified that he knew Godinez wanted him to come over "to discuss the problem [they] had with the money," and that Godinez thought Reynoso was "ripping him off with a bunch of money from the drugs" that Godinez had previously given Reynoso to sell.

During his cross-examination of Reynoso, the prosecutor asked Reynoso whether he had "change[d] the reason . . . [he was] at Mr. Godinez' house" during the course of the trial.  The trial court overruled Avila's and Reynoso's objection that the question was "improper impeachment."

During a subsequent bench conference, the trial court opined that any prejudice from the question could be cured by an admonition.  Reynoso's attorney then moved for a mistrial on the grounds that any argument by the prosecutor that Reynoso had deviated from his anticipated testimony, as characterized by counsel in his opening statement, would invade the attorney-client privilege as to what Reynoso told his attorney and would force counsel to testify.  The trial court denied the motion on the ground (among others) that Reynoso's trial testimony did not directly contradict the description of the anticipated testimony made in opening argument.  Moreover, although the prosecutor had indicated that he did not intend to argue that "Mr. Reynoso has changed his story from what he told [his defense counsel] originally," the court opined that it would not be misconduct for him to probe Reynoso during cross-examination or to question him "about changing the story or making a new story."

In his final closing argument, the prosecutor argued, without objection that following Joseph Cobb's testimony, Reynoso "ran out of reasons to be in [Godinez's] house lawfully"; accordingly, he concocted the story that he had gone to see Godinez that night to discuss a longstanding drug-related debt:

"This case didn't begin with Mr. Reynoso's lawyer saying David Reynoso is going to tell you that there was a drug deal, that he

1    owed money.

2    "This case began with Kristina Ramirez and David Reynoso had a
     relationship, and the clear implication from the beginning of the
3    case was that Mr. Reynoso was there over some beef with Kristina
     Ramirez.
4
     "And then what happened was, with each witness, I tried to ask
5    him . . . was there anything going on between these two?  No.  No.
     No.
6
     "So, the, the left turn was taken into narcotics use.
7
     "Don't blame [Avila's counsel] Mr. Samuel.  He is what he is, by
8    his own words, just an advocate for Mr. Avila.  Do not blame Mr.
     Herrera [Reynoso's counsel].  These are two men with integrity
9    who are operating within the law.

10   "But they are only arguing.  They can only do what they have
     before them.
11
     "Mr. Reynoso makes decisions about whether he will testify.  He
12   chose to testify, and when he did, he's the one that fit himself in
     that small little crawl space of how he could get in that house
13   lawfully."

14   Opinion at 52-54.

15        The state appellate court concluded that petitioner had waived his claim of prosecutorial

16   misconduct because of his failure to object to the prosecutor's closing argument at trial.  *Id.* at

17   55-57.  The court also concluded that any prosecutorial error was not prejudicial, reasoning as

18   follows:

19        Secondly, "[t]o prevail on a claim of prosecutorial misconduct
          based on remarks to the jury, the defendant must show a
20        reasonable likelihood the jury understood or applied the
          complained-of comments in an improper or erroneous manner.
21        [Citations.]  In conducting this inquiry, we 'do not lightly infer'
          that the jury drew the most damaging rather than the least
22        damaging meaning from the prosecutor's statements.  [Citation.]"
          (*People v. Frye, supra,* 18 Cal.4th at p. 970; *see also People v.*
23        *Samayoa, supra,* 15 Cal.4th at p. 841.)

24        Acceptance of Reynoso's claim of misconduct would require that
          we conclude that the jury would have treated the statements in
25        Reynoso's opening statement as "facts" to be measured against
          other evidence for a discrepancy.  Again, the jury was repeatedly
26        advised that statements of counsel are not evidence.  Accordingly,

                                        37

1    we decline to infer that the jurors would have treated them as such.

2        (*People v. McLain* (1988) 46 Cal.3d 97, 119-120 [jurors are
         presumed to follow the court's instructions].)
3
         Because Reynoso waived his objection and has not demonstrated
4        that it is reasonably likely the jurors erroneously disregarded the
         instructions not to treat counsel's statements as evidence, he
5        cannot
         prevail on this claim, even assuming misconduct – an issue we
6        need to (sic) reach.

7    *Id.* at 56-57.

8        A criminal defendant's due process rights are violated when a prosecutor's misconduct

9    renders a trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

10   However, such misconduct does not, per se, violate a petitioner's constitutional rights. *Jeffries v.*

11   *Blodgett,* 5 F.3d 1180, 1191 (9th Cir. 1993) (citing *Darden*, 477 U.S. at 181, and *Campbell v.*

12   *Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)).   Claims of prosecutorial misconduct are

13   reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's

14   [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due

15   process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted). *See also*

16   *Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974);

17   *Turner v Calderon*, 281 F.3d 851, 868 (9th Cir. 2002).   Relief on such claims is limited to cases

18   in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice.

19   *Johnson*, 63 F.3d at 930 (citing *Brecht*, 507 U.S. at 637-38); *see also Darden*, 477 U.S. at 181-

20   83; *Turner*, 281 F.3d at 868.   Put another way, prosecutorial misconduct violates due process

21   when it has a substantial and injurious effect or influence in determining the jury's verdict. *See*

22   *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).   Finally, it is the petitioner's burden

23   to state facts that point to a real possibility of constitutional error in this regard. *See O'Bremski*

24   *v. Maass*, 915 F.2d 418, 420 (9th Cir. 1990).

25       In considering claims of prosecutorial misconduct involving allegations of improper

26   argument the court is to examine the likely effect of the statements in the context in

1  which they were made and determine whether the comments so infected the trial with unfairness

2  as to render the resulting conviction a denial of due process. *Turner*, 281 F.3d at 868; *Sandoval*

3  *v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2001); *see also Donnelly*, 416 U.S. at 643; *Darden*, 477

4  U.S. at 181-83.   Thus, in order to determine whether a prosecutor engaged in misconduct in

5  closing argument, it is necessary to examine the entire proceedings to place the remarks in

6  context. *See United States v. Robinson*, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment must

7  be examined in context. . . ."); *Greer*, 483 U.S. at 765-66; *Williams v. Borg*, 139 F.3d 737, 745

8  (9th Cir. 1998).

9        Petitioner has failed to demonstrate that the prosecutor's closing argument violated his

10  right to due process.  It was apparent from the trial proceedings that petitioner's testimony as to

11  why he went to Godinez's house differed from the reason expressed by his counsel during

12  opening argument.  Reminding the jury of the obvious did not render petitioner's trial

13  fundamentally unfair.  Citing *United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980),

14  petitioner argues that the prosecutor's remarks insinuated that "the defense had put on a case that

15  was a lie, that the defense attorney's (sic) knew this and that they had to proceed at their clients'

16  demand."  Traverse at 10.  Petitioner contends that this penalized petitioner for exercising his

17  Sixth Amendment right to counsel, gave rise to an "impermissible inference" that petitioner was

18  guilty, and reduced the prosecutor's burden of proof.  *Id.* at 11-14.

19        In *McDonald*, the defendant sought to exculpate himself by offering proof that a search

20  of his residence had proved fruitless.  The Fifth Circuit held that a comment by the prosecutor

21  which informed the jury that defendant's lawyer was present when the search warrant was

22  executed penalized defendant's exercise of his right to counsel because it suggested that the

23  retention of counsel was inconsistent with innocence.  That is not the case here.  The prosecutor

24  merely pointed out what was already obvious: that Reynoso's stated reason for going to

25  Godinez's house on the night of the shooting differed from the reason suggested by his counsel

26  during opening argument.  There could have been many reasons for this development, and the

1    prosecutor did not brand petitioner a "liar," impugn the integrity of defense counsel in any way,

2    or suggest that the retention of counsel was inconsistent with innocence.  Under no reading of

3    the prosecutor's argument can it be said that the prosecutor penalized petitioner for the exercise

4    of his right to counsel or that his argument otherwise violated petitioner's federal constitutional

5    rights.  Petitioner has failed to demonstrate that his trial was rendered fundamentally unfair as a

6    result of the prosecutor's comments during closing argument.  Accordingly, he is not entitled to

7    relief on this claim.

8           For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

9    application for a writ of habeas corpus be denied.

10          These findings and recommendations are submitted to the United States District Judge

11   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

12   after being served with these findings and recommendations, any party may file written

13   objections with the court and serve a copy on all parties.  Such a document should be captioned

14   "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

15   within the specified time may waive the right to appeal the District Court's order. *Turner v.*

16   *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

17   DATED:  April 13, 2007.

18

19                                              EDMUND F. BRENNAN

20                                              UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26